Good morning, your honors, and may it please the court, Mohamed Tatsar for the plaintiff's appellants. Do you need some water or something? I actually have been drinking an extraordinary amount of water. Well feel free to take it. Thank you. I'll take that. What I was going to say, your honors, is one of the plaintiff's appellants, Nora Phillips, is in the courtroom this morning. If I may, I'd like to reserve three minutes for rebuttal. Okay, please, go ahead to the clock. Thank you. The Supreme Court has recognized that courts' remedial powers in constitutional cases, the purpose of those remedial powers is to place a person who's challenging government misconduct in, quote, the position they would have been in the absence of that government misconduct. That's from U.S. v. Virginia, Millick v. Bradley. The question for the court this morning is whether the government can immunize itself from a limited injunction seeking to do just that, place the plaintiffs in the position they would have been in the absence of the secret surveillance program that created the records they now wish to expunge. Well, counsel, notwithstanding your characterization, it looked to me like the only information that was contained in the situation briefing was basically readily available information. So I mean, it's not like we have Title III wiretaps or surreptitious entries and searches of the subjects' homes. I view that document as basically a tactical briefing for CBP commanders on what everybody acknowledges was an unusual event, a wave of migrants that were approaching the U.S. border. I mean, is it your position that CBP can do nothing in preparation for an onslaught of tens of thousands of people who may try to cross? Two responses, Judge Solomon. So first is there was actually a mixture of, quote-unquote, more or less public information, but also deeply private information. We can talk about that. And the second is, even if that weren't the case- But what deeply private information? So for instance, in page 1978 of the record, there's an FBI document about the plaintiff, Mr. Denison, that describes his work, specific information about his work, with whom he lived, the purpose of his journalism, and a number of other things. In 1253, the document about El Ochoalado- But is it your position that no law enforcement agency in carrying out its duties to ferret out and prevent violations of the law is permitted to gather any kind of investigative information on subjects? No, certainly not, Judge Solomon. That is not our position. We do not challenge the government's ability to conduct law enforcement investigations generally. The claims, the principal claim in this case, was about retaliation. Right? So our claim was that the government targeted the plaintiffs in particular for a retaliatory purpose because of the work that they did. But I thought the acts of retaliation were perpetuated by the Mexican government. No, in part. But that act by the Mexican government was done at the behest, we've now learned, at the behest of the United States government. But at the time that you were before the district court, you didn't have any evidence of that, right? We did not. That's right. We sought it. We sought it in part through the OIG discovery. But what we got back from the government in terms of the deposition testimony was statements that the government didn't do that. We have now learned, after the notice of appeal was filed, that it was in fact the government, they essentially misled us. It was the government who specifically ... Okay, but aren't we constrained by the record that was before the district court? Certainly. I think you're constrained by the record before the district court. The reason why we brought that, we have cited this new evidence, is to suggest that it would have come to our attention had the district court not prevented us from seeking that discovery. Well, but I mean, that kind of puts the cart before the horse. In essence, what you're saying to the district court is we want to go fishing because we expect that there will be fish there without being able to show at the time that there were in fact fish in the pond. I disagree respectfully, Justice Helman. I do think we have plenty of evidence from the Mexican authorities about how they acted specifically at the BS in the United States government. You need to distinguish in your answer between what you know now versus what you showed the district court then. No, no, no. I'm sorry if I didn't come across clearly. The plaintiffs themselves were told, and they testified in discovery, that the reason why they were being deported from Mexico was because of alerts that were placed by the United States. So we had suspicion, and we alleged it, and then what we asked the government about was precisely that, and the government gave us a different answer. Now, what I want to go back to is to suggest that the district court's requirement that we produce additional evidence of future harm associated from these records, that requirement, if this court were to adopt it, would require this court to overturn at least a half a dozen of its cases, and that district court's requirement, you know, that would be what the government's position is this morning, and we don't, and the government didn't really meaningfully address those cases. So the district court said that in your opposition to the motion for summary judgment that, and your request, didn't identify the specific facts that would, were essential to opposing summary judgment, which, because the summary judgment was based on the standing likelihood of future harm, the opposition or the request would have to identify what facts would support that, and so the government says, if you look at the opposition to the motion of summary judgment, there isn't anything that identifies facts related to likelihood of future harm. Is that wrong? We disagree with that standard. We don't think we have to. You don't think the 50-60 standard applies? Oh, no, no, I'm sorry. No, the 50-60 standard does apply. We think the standard that the district court imposed for demonstrating Article III standing to seek expungement, that standard was erroneous. Is it the likelihood of future harm element or some other element? It is the requirement of producing evidence showing a likelihood of future injury arising out of the records that the government concededly keeps. Well, the district court said you had to identify specific facts that would be elicited through further discovery that would yield facts showing likelihood of future harm, and that, so in other words, you didn't explain what information, this is what the district court said, you didn't explain what information you were seeking for the six extra depositions in the OIG that would show a likelihood of future harm. So Judge Okuda, the district court did not do that when ruling on the 50-60 motion. So the district court basically issued a conclusory minute order that didn't describe what it is that the district court was saying with respect to Article III or even the merits of the case, right? That's our contention about discovery. Your contention is that the district court didn't address the merits of the discovery motion? Right. We have two contentions on the discovery issues. One is what I call procedural and one is substantive. The substantive issue about whether or not we're entitled to additional depositions is sort of, you know, that's a substantive question. On the procedural problem, right, the procedural problem is that the district court deferred and then didn't decide, didn't provide reasoning for its decision about its rule. It did decide, though, because it says, accordingly, the Rule 50-60 request is denied, and it says the reason is because the request didn't meet the standard. So is your argument that the district court abused its discretion in not providing more reasoning? That's right. That's right. Okay, so your argument, you don't argue that the district court didn't rule and denied the discovery request. You're just saying it was an abuse of discretion not to provide more reasoning. We're saying two things. That's in part what we're saying, Judge Acuda, but we're also saying that part of what the problem was addressed the OIG discovery in the format that it should have addressed it in, which was in a motion to compel. Okay, so let me just get back to the summary judgment, because that's what we're looking at based on your arguments. The district court, had the district court provided more reasoning, if it had looked at your request and had it looked at your opposition to summary judgment, which was also based on 56-D, would it have found reasoning as to why there was a likelihood of future harm? It would have found reasoning about the likelihood of future harm, but I don't, we also... I didn't see that in the, so maybe you can point to where you said that if you got the additional depositions, et cetera, there would have been information that would have helped you show a likelihood of future harm. Oh, I misunderstood your question, Judge Acuda. No, so, no, I don't think we presented that to the district court. Okay. Let me be clear. So we proceeded to the district court under the theory that the district court's standing, under the theory that the standing requirement was not that high, so that we did not demand additional evidence for the Article III showing that the district court bound us to. So I hope that's clear. Yes, thank you. And so then, when the district court eventually made its Article III ruling, we realized that the court's Article III ruling was using a standard that we think is erroneous and contradicts this court's precedent. What I'd like to say, at least on the Article III question, is I want to make three quick points, if I may. One about retrospective relief, the other about the court's most recent cases on Article III. Can I just, I apologize, but can I just divide this again, because there are two different parts to your argument before us today. One is on the deposition and the discovery request. The second is on a different Article III issue related, as I understand your argument, your view is that the district court erred in holding that the plaintiffs lack standing on the expungement of records because the maintenance of those records itself is an ongoing injury. But that doesn't seem to relate to whether the district court abused its discretion on denying the discovery request, because you're not saying you needed any additional discovery for the expungement argument. Am I right on that? That's right. So the discovery questions would reveal evidence that goes to the merits of the case, and now they would also reveal information that would go to the standing question that now is- On expungement. Correct. But if I understand your argument, you're saying no additional discovery was necessary because merely the maintenance of the expungement records is enough. That's right. So our position is, no additional discovery is necessary. But even if it is, even if this court decides it, then we still have outstanding discovery that we could use to meet that higher threshold. That's, I think, the gravamen of our discovery issues. So I want to make a point about the retrospective nature of the limited injunction that we're seeking. So our injunction is not a prospective one seeking policy change. We're not trying to change how the government, Judge Talman, conducts investigations or anything alike. We're seeking a limited injunction to destroy records which we have alleged the government created on a retaliatory basis. So could I just ask, I understood that argument, but when you made a few remarks at the opening that I was confused by. I thought that the only record that was argued to have been created in retaliation was this PowerPoint document. Oh, no, Judge Okuda. So the PowerPoint documents, just to be clear about this, was a sort of amalgamation created by reference to a whole trunk of records about the plaintiff. And were those records created in retaliation? Yes, so that's what we have alleged. So those records, so just to be clear, for instance, there's a record at page 776. It's from November of 2018 in which the government listed Ms. Phillips among other people and listed her as having publicly expressed concern for migrants and saying that these people provide legal services and assistance for asylum claims. You know, there's variations of databases that call the plaintiffs pro-caravan and Mr. Dennison as an anarchist, falsely. And there's a whole load of different sort of tranches of intelligence records. What the government did was they queried those, created this PowerPoint, this watch list, and then used that watch list to detain and deport the plaintiffs. And the PowerPoint tipped you off? Exactly. And so what happened was the PowerPoint was leaked. And once that leaked, then we understood that the PowerPoint was the sort of tip of the broader set of records that were created by the government. Counselor, I'm having a hard time on the injury issue based on what you just said, where the district court recited the fact that Plaintiff Dennison had crossed the border 116 times between September 22 of 2019 and September 22 of 2020, and the district court concluded that there's simply no evidence based on that record that, in essence, he was likely to be further questioned or stopped or prevented from crossing. And then he, with regard to Ms. Pinheiro, that she had traveled largely unimpeded across the border and had crossed 130 times prior to June 5, 2020, and 20 times after June 5. So Judge Solomon, I guess I'm trying to understand your conclusion that there's some continuing injury here if they're freely crossing back and forth. So two points, Judge Solomon. The first is, so at the time we filed this lawsuit, none of that was true. So standing generally is decided at the time the lawsuit is filed. Second point, the standing question, the expungement issue, goes to the existence of the records. And our position is that this court's jurisprudence, Norman Bloodsaw, Fazaga, Mayfield, all say that the retention of these records by itself, absent any kind of evidence of future injury, that is an injury that sufficiently seeks standing to expunge records. But is your position that Customs and Border Protection is not permitted to maintain records of people who frequently cross the border? No. No, certainly not, Judge Solomon. So why are you entitled to an expungement of that information? Because our merits argument is that the government created those records in retaliation, right? So what I would note is this court has been- In retaliation for the exercise of First Amendment rights? Exactly right. Exactly right. So this court in O'Brien, for instance, that was a case from I think 2016, 2017, has said that even government action that would be lawful to take if conducted on a retaliatory basis is unlawful. That's our point. What is the strongest authority in support of your position here that these records were retaliatory for- the retention of these records was in retaliation for First Amendment rights? What's the closest case to support your theory that you can get expungement on that basis? So we- there are a number of cases. I mean, one of them- the most recent case I think this court- in which this court addressed this expungement question was Fazaga, right? Fazaga was a case kind of remarkably sort of similar in the sense that there was a government surveillance- I mean, in Fazaga, there were- I mean, we're sending in undercover people, we're surreptitiously recording conversations, we're running Title IIIs, we're issuing FISA orders. That's true. There's no evidence of that here. That's true. But also in Fazaga, there were- there was a collection of much more mundane information, actually. Hundreds of email addresses, thousands of phone numbers, background information about the plaintiffs. It was a mixture in Fazaga. And all of that information is subject to expungement under this theory. So it's both private information- So your position is that CBP cannot maintain records of people who crossed the border for any reason? No, no, no. Because the mere existence of those records is a constitutional violation. Only if CBP conducts an investigation that violates the Constitution, so it conducts that in violation of the First Amendment, or if it unlawfully searches and detains individuals in violation of the Constitution, then those records are expunged. But if CBP doesn't violate the Constitution and creates records, those are fine. Yes, but your retaliatory theory- I'm sorry, it wasn't very precise- the theory that this entire investigation was conducted for a retaliatory purpose, and therefore unconstitutional. That's right. What is the strongest authority? Sorry, so to go back to the Fazaga case, part of what happened in Fazaga was that the plaintiffs there alleged that they were targeted because of their religious expressions and their associations. That's partly what motivated the government's interest in them. And so the issue before this Court was, could you seek expungement of the fruits of that retaliatory investigation and the discriminatory investigation? Do you have standing to seek that if the government continues to maintain those records? This is similar to that? This is similar to that because what the government did here was it basically went out, identified individuals that were, in its parlance, pro-caravan or pro-migrants or anarchists or antifa. Some of the information that they collected about the plaintiffs was flat out false. But how is that different from aiding and abetting the illegal entry, if that's what the caravan is intending to do? It is different for two reasons. I mean, providing legal assistance to asylum seekers is not unlawful. I understand. There's obviously a line that has to be drawn there, but- But importantly, Judge Talmadge, the government never, never, never had any suspicion that the plaintiffs, particularly Plaintiffs Nora Phillips and Erica Pinero, ever committed any crime. Right? They did not suspect anything of them. Nevertheless, they targeted them for the purpose of expungement. I thought the purpose of the investigation was to find out who was assisting or aiding these caravans in approaching the border. That was the, that was what the government said. So is that a permissible purpose or would you conclude that that's impermissible? No, it could be. It could be. But as generally, I mean, this is a large interagency government program, Operation Secure Line. But as to the particular plaintiffs and as to the particular individuals on this PowerPoint, which included journalists and lawyers and others, those individuals were targeted specifically because of their protected activity. And that we think was unlawful. That question, the merits question, we can decide down below. We may well be wrong. I guess I'm having a hard time understanding how you're able to discern the purpose of when there could be a very fine line between aiding and abetting or rendering legal advice. I mean, didn't the Supreme Court just take up that question this week about whether or not the First Amendment permits people to actively encourage illegal border crossing? That's right. This question, this is a well-worn question. Senating Smith, I think, is another case on this point. All of those are merits determinations. The point here is to say, do we have standing to get there? The standing question is, do we have records here that the government indefinitely collects that we allege were unlawfully obtained? And if the answer to that is yes, then Mayfield says, that's an injury in fact. Norman Bloodsaw says, that's an injury in fact. Fazaga says the same thing. I guess I'd have a much easier time accepting the argument if we didn't have this large mass of illegal immigrants approaching the border. In other words, if this information had just been sort of gathered as part of general day-to-day ongoing border operation. Maybe. I mean, it may well be. If it was just that and it wasn't retaliatory and all that, we would lose. I mean, that's true. No, no, no, no. I think you'd have a stronger case if the only evidence was First Amendment-protected activities. That's right. Well, I don't want to take up any more of your time. Yeah, I see that. You're well over time, but we'll give you a minute for rebuttal. Thank you so much. I appreciate that. Thank you. Good morning, and may it please the Court. Thomas Pullen for the Attalees. As this case comes to the Court, the issues are fairly narrow. The plaintiffs have abandoned their claims for injunctive relief aimed at future information gathering activities. They've also abandoned their claims under the Privacy Act. So the only issue that this Court need decide is whether the plaintiffs have standing to seek an injunction ordering the defendant agencies to expunge records containing information about them. That question is resolved by applying two well-established principles of standing. First, it is a plaintiff's burden to demonstrate standing for each claim that she brings and for each form of relief that she seeks in the manner generally applicable at the relevant stage of litigation. So at summary judgment, a plaintiff must come forward with evidence of specific facts that demonstrate standing and cannot rely on general allegations. The second principle is that a plaintiff seeking injunctive relief must demonstrate either a present ongoing injury or a risk of imminent future harm. She cannot rely on a past injury alone. This Court and others have applied these principles to hold that a plaintiff has standing to seek the expungement of records to stop an ongoing violation of cognizable privacy interests or to prevent a threatened harm caused by use of the records in the future. Adopting the rule urged by the plaintiffs here, where no injury need be demonstrated to have standing to seek a specific form of injunctive relief, would not only break new They are arguing that there's an ongoing injury, right? That the maintenance of the records that they have, which they argue are unlawful because they were collected in retaliation for an exercise of their First Amendment rights, is itself an ongoing injury. So what's wrong with that argument? Well, I think that argument kind of runs headlong into Laird and its progeny, which held that in that case, plaintiffs challenged information gathering activities by the Army and said this violates the First Amendment. They pointed in their brief to the Supreme Court to a specific record. They quoted from a record that detailed their associational activities, and they said this violates the First Amendment. And the Supreme Court said this claim was not justiciable because you haven't identified a specific harm. So I don't think plaintiff's theory can be in any way reconciled with Laird and the cases under it. And this court has always, when it has found standing to pursue expungement, has relied on an ongoing privacy-related harm for a Fourth Amendment claim. For example, as the colloquy explored earlier in Fasaga, there were wiretaps, there were surreptitious recordings. In Norman Bloodsot, there was a violation of the interest in bodily integrity because there were tests run on samples without consent that the Supreme Court has identified as a violation of Fourth Amendment interests. And in cases going back to... Well, yes, but the argument is that this is a violation of their First Amendment interest because they're getting targeted for associational or other things that they're doing that were exercising their First Amendment rights, and they haven't violated the law. Well, and if plaintiffs had sought damages or some form of retrospective relief, that past harm might well be enough to support standing. But here they've requested an injunction, a prospective injunction requiring the agencies to delete records. And it's well-established that prospective relief like that requires either an ongoing harm or a future imminent harm. If the problem were that the government was targeting people who went to the Lutheran church and had kept records on those people, would that violate a First Amendment interest that would justify expungement? There would need to be evidence of a future harm. And this Court has distinguished on that basis in cases like the Presbyterian... Isn't keeping watch on somebody because of their religious activities kind of harmful? Well, I mean, that's... With respect to associational activities, which is what is alleged here, that's exactly what happened in Laird. The Army was gathering information on certain people who undertook certain activities and all the cases under it. The Second Circuit case involved a peace protest. Other cases that we cited involved kind of classroom activities or other associational activities. It doesn't violate any First Amendment kind of protected interest for the government to take note of activities that are being performed in public. The plaintiffs are publicly associated with Al Otrulato. Ms. Phillips and Ms. Pinheiro had high positions in that organization. Mr. Dennison attended and was... The government received information indicating that he attended the attempted border incursion. Well, more than one. So information related to this doesn't... The fact that the government kind of takes notice or has information relating to these activities doesn't impinge on any First Amendment activity here any more than it did in Laird. Now, if the government took action based on this that harmed... Action based on these records that harmed the plaintiffs and they demonstrated that this was going to happen in the future, that could support standing. But they haven't indicated any problem that way. In fact, the colloquy earlier kind of explored this a little bit. Both Mr. Dennison and Ms. Pinheiro have crossed the border over 100 times without incident from CBP. There's no evidence here that the plaintiffs are prevented from engaging in any of their associational activities or that the government has taken kind of proscriptive or regulatory action that would dissuade them from engaging in those behaviors. If the government is ongoing watching you because of your visits to the border and has selected you because of that, isn't that harmful? Would you want to be spied on by the government because you went to a certain place? Well, I think there's a difference between what an individual wants and how the individual wishes a government would behave and a cognizable injury. Now, Your Honor referred to if the government kind of... I think part of that question was if the government did something at the border because it was tracking you. That could be an injury that would give rise to standing. The plaintiffs don't have any evidence that they face difficulties crossing the border because of these records. I don't think, based on the record before us, any rational trier of fact could think that there's a genuine issue of fact there. Could I get back to Judge Schroeder's Lutheran Church example? So if the government makes a list, surveils the Lutheran Church, makes a list of everyone who goes in and has a record in their files of everyone who has gone into the Lutheran Church, I take it your position would be merely maintaining that record is not expungeable because it's not an invasion of privacy. It doesn't cause any harm. But I think their argument is that what if the Lutheran Church record, the list of members going into the Lutheran Church was made in retaliation for their expression of Lutheran ideals. So they alleged a retaliatory motive in making that list and maintaining those files. Opposing counsel says that makes a difference. Why doesn't that make a difference if they have a retaliatory motive? I think there still has to be some kind of injury in fact to a cognizable harm. Your Honor's hypothetical doesn't sound very much different from Laird where the army was gathering information on a certain population based on specific activities. And the Supreme Court said unless you can demonstrate some harm, this isn't justiciable. Now there may be circumstances where the gathering of this information does create harm. For example, in Scott v. Rosenberg, the plaintiff said that my religious beliefs require that my charitable giving be secret. So when the government tries to get information about that, this conflicts with my religious belief that the giving must be secret in order to be effective. You don't think that the keeping of records of people who go to the Lutheran Church chills their right to go to church? I think that's basically what the Supreme Court said in Laird, that a chilling effect is not sufficient to support a First Amendment claim unless the challenge exercise of governmental power was regulatory, prescriptive, or compulsory in nature. This was underscored in Clapper more recently. Just the gathering of this publicly available information does not cause any cognizable harm. So what makes a harm cognizable for the maintenance of records? We know that negative information in the Flint case, invasion of privacy, perhaps in Visaga. What, in your view, would make the maintenance of records a cognizable harm? I think either if it creates an ongoing injury, so in Visaga, in... I apologize, I forgot the name of a recent case. In Visaga, in Norman Bloodsaw, these involved violations of privacy interests protected by the Fourth Amendment. The Fourth Amendment provides the right to be secure in your person, in your home, in your effects. This court has explained in cases like the Facebook v. Campbell case, when it's that kind of privacy intrusion, a protected privacy interest, that itself is the harm. You don't need to demonstrate something else. That's how this court characterized it, I think, or seemed to conceive of it in Visaga, in these other cases. In cases like the Flint case, in cases going back to Wilson v. Webster and others that involve arrest records, it's not the just possession of the information itself, it's the future use. Arrest records may have an effect, or not may, are well known to have an effect on future interactions with law enforcement, on employment applications, a general background check turns up those records. Was there any private information that was accumulated by the government or maintained in its files here that violates their privacy rights? The opposing counsel says there were many, many documents that were created surveilling these individuals. I mean, the plaintiffs certainly say that this information is private, but they haven't pointed to specific information  argued, kind of provided authority that would support that the specific information they're talking about does come within that category. Indeed, they've disclaimed any need to do so. They say it doesn't turn at all on the nature of the information. They cite some First Amendment cases involving compelled disclosure of associations. The associations they're talking about here, none of that was obtained from, they haven't demonstrated how it was obtained from compelled disclosure. There's no evidence that Ms. Phillips and Pinero were ever questioned by the government, much less compelled to disclose their relationship with Olo Trolado. Mr. Dennison was interviewed crossing the border, but the plaintiffs didn't advance any argument with identifying records that came out of that interview and pointing to which information in those records was private and compelled in a manner that violated their rights. Indeed, with respect to Mr. Dennison's Fourth Amendment claim, they don't even have a search claim based on the questioning. The District Court ruled in its motion to dismiss that the Fourth Amendment claim was limited to a seizure of his person, whether he was arrested when crossing the border. There's no causation and traceability with respect to any records that come out of that claim. If there are no further questions, we would ask that the judgment of the District Court be affirmed. Thank you. Briefly, Your Honor, two quick points. One is we're seeking a retrospective injunction, not a prospective one. This Court in Gomez and Bell assumes that the kind of expungement that we're asking for is retrospective. That's part of the reason why we can presume damages from the existence of records. The question about Laird, the reason why Laird is distinguishable, is for three reasons. One, it wasn't clear that the actual data collection in Laird in the first instance was unlawful. It wasn't. Second, there was no allegation of past harm. We have that here. And third, it wasn't even clear that the Army continued to retain the records. They started destroying them within 60 days. That's not this case. This case, we have actually alleged harm. The plaintiffs were detained. From the maintenance of the records or harm from something else? No, from the maintenance of the records. They were arrested and detained or, at the behest of the Mexican government, deported because of these records. I have a question. Opposing counsel said you didn't point to any privacy interest that was impinged on. Do you agree with that? We disagree. So at 1253, the El Otro Labo document has private information about the plaintiffs. It includes, for instance, money transfers from Ms. Pinheiro to other people. It includes private biographical information about Ms. Phillips. Mr. Denison's FBI record includes private information about him. So there's a whole wealth of information about them. I'll point this court to Mayfield, and I see my time is up. But in Mayfield, the government conceded that the records that Mr. Mayfield sought to expunge, those records, it was wholly speculative that those records would result in his arrest in the future. He had been cleared. Nevertheless, this court held that maintenance of those records was an injury in fact, even though it was unlikely he would be arrested again because he had been cleared. So this court's jurisprudence on Article III makes clear that what the government has done here, collect these records... But in Mayfield, wasn't he suspected of participating in the Madrid train bomb? That's right. And then eventually it ended up being cleared. And so what he sought... And they thought at one point that they actually had a fingerprint of his that turned out not to be the case. Yeah, but he said that was illegal, whatever. He ended up challenging it, and they reached a settlement. It seems to me he's got a much stronger argument for harm than what I see on this record. He didn't have a stronger argument for harm associated with the derivative FISA materials that the government retained. What he sought specifically was, I want to destroy the remaining FISA documents. After I've been cleared, I want to destroy these. The government said, why? We're not going to do anything with you anymore. These records don't matter. But this court said, no, they do. They were created... He alleges they're unlawful, so you can destroy them. He's been wrongfully arrested for a very, very serious crime. That's right, but the standing question doesn't depend on the seriousness of the issue. It does if we're trying to determine whether or not it's constitutionally cognizable harm. You don't have a right to just freely cross the border without having any interaction whatsoever with border officials. You do not, but you do have the right to cross the border without being retaliated against. That's the plaintiff's position, and that's what they've alleged. They've alleged actual harm associated with the maintenance of these records. Apart from Dennison, who was actually, as I understand it, interrogated, what happened to the other plaintiffs that would constitute harm? In addition to the record collection itself, we now know that the plaintiffs, as a result of these records, those other two plaintiffs were... The government provided those records to the Mexicans and requested that they detain and deport them from Mexico. That's the harm, and that harm is cognizable as a form of injury resulting from the record collection. Any more questions? Thank you, Your Honors. I appreciate it. I think we have your argument. The case of Nora Phillips versus U.S. Customs and Border Protection is submitted, and we're adjourned for this session. All rise. This court for this session stands adjourned.
judges: SCHROEDER, TALLMAN, IKUTA